LEWIS, ET AL. BY THEIR NEXT FRIEND, V. HUDSON, AND
ANOTHER.

<div style="float:right">6   463<br>116   271</div>

1. *Semble*, that where personal property is given to the *sole and separate* use of a *feme covert*, she may, as incident to such an interest dispose of it by will; and although she be entitled only to the profits derivable from the enjoyment of the property, she may, under an authority from her donor, declare who shall enjoy it after her death.

2. The bill alleges that the person entitled to a life-estate in slaves, is greatly indebted, judgments for a large amount have been recovered against him, and other suits are still pending; he has made an assignment of much valuable property ; complainants have been informed that he is preparing to remove the slaves, and they are apprehensive they will be levied on, pass into the hands of strangers, and be carried without the State, so that they will lose their rights, or be compelled to assert them in a foreign jurisdiction ; that he has been arrested in Georgia on several *ca. sas* , given bond and security to take the insolvent oath, to comply with the condition of which, and obtain his discharge, he will be compelled to deliver up the slaves; that a third person has interposed a claim to them, which is now litigated with some of the creditors of the person entitled to the present interest : *Held*, that these allegations show such a danger of loss of the slaves, as to authorise a court of equity to entertain a bill *quia timet*, at the suit of those entitled in remainder.

WRIT of error to the Court of Chancery for Russell county.

The complainants filed their original, and an amended and supplemental bill against the defendants, Jonathan A. and Granberry Hudson, setting forth that Anderson Abercrombie, of the State of Georgia, did, on the —— day of July, 1831, convey to Charles Abercrombie sundry slaves, (whose names are particularly mentioned.) "To have and to hold to him, upon trust and confidence, to receive and pay the rents and hire thereof to Martha E. Abercrombie, to her sole and separate use, independent of the control of her intended husband, and during the natural life of her, the said Martha E." On the fifteenth of August, 1831, Martha E. Abercrombie intermarried with the defendant, Jonathan Hudson; and on the third of May, 1834, she made her last will and testament in writing, according to the laws of Georgia, where she then resided, by which she gave the slaves in question to her husband for life, and after that event, to be equally

divided between the children of Sarah Ann Lewis, who are the complainants. The will further provided, that in no instance were the slaves to be subject to sale for the payment of the debts of Jonathan A. Hudson.

It is further alleged, that the testatrix died on the 12th of June, 1834, without issue, leaving her will unrevoked and in full force; that the same had been proved, but the executor had since died, and no administrator had been appointed to succeed him in the execution of the will. The slaves are now in the possession of Jonathan A. Hudson, in the county of Russell, in virtue of the deed in trust for Mrs. Hudson, and her will subsequently made.

The complainants allege, that Jonathan A. Hudson is greatly embarrassed, that suits for the recovery of four thousand dollars and upwards have been instituted against him in the circuit court of Russell; that they are informed that judgments, for a very large amount have been recovered against him in the circuit court of Montgomery, as well as in Russell; that writs of *capias ad satisfaciendum* have been sued out in Georgia against him, for a sum exceeding two thousand dollars; *further*, that he has made an assignment of much valuable property.

It is further stated, that the complainants are informed that Jonathan A. Hudson is preparing speedily to remove the slaves in controversy: further, they apprehend that executions will be levied on them, and they will thereby pass into the hands of strangers, and be carried beyond the jurisdiction of the State, so that the complainants will entirely lose their rights, or be compelled to prosecute suits abroad for their recovery.

In the amended and supplemental bill, it is stated Jonathan Hudson is entirely insolvent; has been arrested in Georgia, on several writs of *ca. sa.*, and has entered into bond, for his appearance to take the benefit of the act for the relief of insolvent debtors; that according to the laws of that State, he will be compelled to deliver up the slaves in question in order to obtain his discharge. It is further stated, that Granberry Hudson has interposed a claim to these slaves, and that it is now in a course of litigation in the circuit court of Russell, between him and some of the judgment creditors of his co-defendants, who have caused their executions to be levied on them.

The bills pray that process may issue, &c., requiring the seizure of each of the slaves, &c., and detain them in custody until

the defendants, their agent, &c., shall give bond with surety; conditioned to have them forthcoming to abide the decree of the court in the premises. An order was made in conformity to the prayer of the bill, the slaves seized and bond given; but, afterwards, on motion of the defendants, the bond was discharged, and the bill dismissed for want of equity, at the costs of the next friend of the complainants.

BELSER and N. HARRIS, for the plaintiffs in error, made the following points :

1. A court of equity has jurisdiction in order to protect the rights of persons entitled to personal property on the death of an intermediate holder. This jurisdiction results from the necessity of the case, and because a court of law is incompetent to act efficiently. [4 Dess. Rep. 29.]

2. The ancient doctrine was, that one entitled to a remainder in personal estate, might compel him, in whom the present interest was vested, to give security that the goods be forthcoming at the determination of his right. [4 Dess. Rep. 29; 1 Brown's Ch. Rep. 274; 1 P. Wms. 1.] But by the more modern rule, the law has been relaxed in favor of the person having the first estate. [1 Brown's Ch. Rep. 279; 3 P. Wms. Rep. 336; 2 Paige's Rep. 132.]

3. Where there is reasonable ground for apprehension on the part of the remainder-man, the court will order the tenant for life to give security for the property. [2 Story's Eq. 141; 4 Dess. Rep. 26; 2 McC. Chan. Rep. 36; 2 Paige's Rep. 132; 1 Iredell's Eq. Rep. 134; 6 Ves. Rep. 172; Meek's Sup. 68, § 15.] Again: the complainants are infants, and entitled to the special protection of a court of chancery.

No counsel appeared for the defendants in error.

COLLIER, C. J.—It is perfectly clear, that the deed, by which the slaves in question were conveyed by Anderson Abercrombie in trust for Martha E., created an estate to her *sole and separate use;* in fact, it asserts, in terms most explicit, that such was the intention of the donor. This being the case, it was competent for her to dispose of them by will. [Henly v. Philips, 2 Atk. Rep. 49; Ross v. Ewer, 3 id. 160; 3 Bro. C. C. 8.] In Rich

v. Cockel, [9 Ves. Rep. 369,] the instrument expressed a trust for the separate use of the wife, without adding any power of disposition by deed, will or other writing. The Lord chancellor held, that as incident to such an interest, she might dispose of it by will. That although a married woman cannot, in contemplation of law, make a valid will, yet if she executes a writing, purporting to be a will of her separate property, a court of equity will treat it as such, and require it to be proved in the proper court before they will pronounce upon it; and probate will be granted without the assent of the husband. [Wagstaff v. Smith, 9 Ves. Rep. 520.] Whether, in the present case, the donee took such an interest in the slaves as would authorize her to dispose of them by will, we need not inquire; for, conceding that she was only entitled to their hire or earnings during her own life, she was expressly authorized by the donor to declare by will, in whom they should vest after her death. Without adding more on this point, we will proceed to inquire whether the facts disclosed in the bill, warrant the interference of chancery for the protection of the complainant's rights.

Where a specific legacy is given to one for life, and after his death to another, the legatee in remainder was formerly entitled, in all cases, to come into a court of equity, and have security from the tenant for life for the delivery of the legacy to the remainderman. But the modern rule is not to entertain such a bill, unless there be some allegation and proof of waste, or of danger of waste of the property. Without such ingredients, the remainderman is only entitled to have an inventory of the property bequeathed to him, so that he may be enabled to identify it; and when his absolute right accrues, to enforce its due delivery. [1 Story's Eq. 562; Foley v. Burnell, 1 Bro. Ch. Rep. 379; Slanning v. Style, 3 P. Wms. Rep. 336; Covenhoven v. Shuler, 2 Paige's Ch. Rep. 132.]

Mr. Justice Story says, in all cases "where there is a future right of enjoyment of personal property, courts of equity will now interpose, and grant a relief upon a bill *quia timet,* where there is any danger of loss or deterioration, or injury to it in the hands of the party who is entitled to the present possession. [2 Story's Eq. 140–1–2–3, and note 1; Randolph's adm'rx v. Kinney, &c., 3 Rand. Rep. 397; Latimer, et al. v. Elgin, et al. 4 Dess. Rep.

28-9-30; 1 Eq. Cases Ab. 360; Fearne on Rem. 414-15; Mad. Ch. 218; Lamb v. Wragg & Stewart, 8 Porter's Rep. 83.]

The grounds, upon which the interposition of equity is asked in the case before us, are—1. That the person entitled to a life estate in the slaves, is greatly embarrassed with debts, and judgments for a large amount have been recovered against him, and suits, for the recovery of more than four thousand dollars, are still pending.   2. He has made an assignment of much valuable property.   3. The complainants have been informed, that he is preparing speedily to remove the slaves in question.   4. They are apprehensive that executions will be levied on them, and they will pass into the hands of strangers and be carried without the State, so that the complainants will lose their rights, or be compelled to sue abroad for their recovery.   5. That Jonathan A. Hudson is entirely insolvent—has been arrested in Georgia on several writs of *capias ad satisfaciendum*—has given bond for his appearance to take the benefit of the act for the relief of insolvent debtors; and according to the laws of that State, will be compelled to deliver up the slaves in controversy in order to obtain his discharge.   6. That Granberry Hudson has interposed a claim to them, which is now in a course of litigation between him and some of the judgment creditors of his co-defendant, in the circuit court of Russell.

Whether the bill, as originally filed, was such as authorized the precautionary or preventive redress which it sought, we will not inquire, as we think, what is called the amended and supplemental bill, presents a proper case for equitable interference.   In the posture in which the case comes before us, we must take all the allegations of the complainant to be true    This being the case, we are to suppose that Jonathan A. Hudson is insolvent—has been arrested on *ca. sas.* in Georgia—has given bond to take the insolvent oath, and that the laws of that State are such as they are alleged to be.   It cannot be intended that the bond was given merely to obtain a temporary discharge from confinement; and it is quite as fair to infer that the principal obligor contemplated a literal performance of its condition, as that it was his purpose to satisfy the execution by the payment of the money.   In fact, the latter presumption cannot be indulged consistently with the idea of insolvency.   The execution of the bond, when considered in reference to the laws of Georgia, is equivalent to an

avowal of intention to remove the slaves into that State, that they might be there sold for the payment of the obligor's debts. The allegation on this point shows, that the rights of those in remainder are in jeopardy, and require protection.

·*Again:* the assertion of a right to the slaves, by G. Hudson, and the litigation thereof with the judgment creditors of his codefendant, is, in itself, a strong circumstance in favor of the relief sought. But whether this, and the grounds stated in the original bill, are sufficient to sustain the jurisdiction of the court of chancery, is an inquiry which we need not make; coupled with the ground already noticed, they detract nothing from its force, but greatly strengthen and support it. It follows from what has been said, that the chancellor erred in dismissing the bill for the want of equity. His decree is, consequently, reversed, and the cause remanded.